331 So.2d 222 (1976)
Gilbert Wayne HEBERT, Plaintiff-Appellant,
v.
HARTFORD ACCIDENT & INDEMNITY COMPANY, Defendant-Appellee.
No. 5347.
Court of Appeal of Louisiana, Third Circuit.
April 7, 1976.
Rehearing Denied May 19, 1976.
Writ Refused July 1, 1976.
*223 Levingston & Liles by Henry R. Liles, and E. C. Hamilton, Lake Charles, for plaintiff-appellant.
Raggio, Farrar, Cappel & Chozen, by Fredrick L. Cappel, Lake Charles, for defendant-appellee.
Before CULPEPPER, DOMENGEAUX and PAVY, JJ.
PAVY, Judge.
This is a suit for workmen's compensation benefits. Defendant filed an exception of prescription which was referred to the merits and sustained after completion of the trial. Plaintiff has appealed.

PRESCRIPTION
On July 25, 1973, while employed as a patrolman in the police department of the City of Lake Charles, plaintiff injured his right knee when he fell while dismounting from a scooter-like patrol vehicle. He was hospitalized twice and treated on an outpatient basis until September 12, 1973, when he was released to resume his employment. Compensation benefits had been paid to that date. Plaintiff returned to work, first on a light-duty basis, and later to the duties of patrolman such as he was fulfilling when injured. He continued working with substantial regularity until March, 1974. During this time plaintiff experienced difficulty (pain, swelling and intermittent locking of his knee) in his employment. On March 12, 1974, while on patrol and without any accidental episode, his knee became extremely swollen. He consulted Dr. George Schneider, the orthopaedist who had treated him during the previous summer, and the doctor diagnosed his condition as a deranged medial meniscus of the right knee. Shortly thereafter, corrective surgery was performed on the involved knee. This suit was filed February 13, 1975. Defendant-Appellant contends that, since the injury was obvious initially and compensation benefits were paid, prescription started at the termination of said payments and ran out in September, 1974, several months prior to the suit filed February 13, 1975.
Plaintiff claims the prescriptive question is controlled by the development-of-injury rule as specified in R.S. 23:1209 and that prescription did not commence until or immediately after the the operation in March, 1974, when the full extent and nature of his condition became known.
R.S. 23:1209 provides as follows:
"In case of personal injury (including death resulting therefrom) all claims for payments shall be forever barred unless within one year after the accident or death the parties have agreed upon the payments to be made under this Chapter or unless within one year after the accident proceedings have been begun as provided in Parts III and IV of this Chapter. Where such payments have been made in any case, the limitation shall not take effect until the expiration of one year from the time of making the last payment. Also, where the injury does not result at the time of, or develop immediately after the accident, the limitation shall not take effect until the expiration of one year from the time the injury develops, but in all such cases the claim for payment shall be forever barred unless the proceedings have been begun within two years from the date of the accident."
The last sentence of that provision was added in 1934. It is generally considered that the landmark jurisprudence interpreting the amendment is that represented by *224 the trilogy of cases of Mottet v. Libbey-Owens-Ford Glass Co., 220 La. 653, 57 So. 2d 218 (1952); Johnson v. Cabot Carbon Co., Inc., 227 La. 941, 81 So.2d 2 (1955); and Wallace v. Remington Rand, Inc. et al, 229 La. 651, 86 So.2d 522 (1956).
In the Wallace case the court stated:
"The court, in Mottet v. Libbey-Owens-Ford Glass Co., supra (220 La. 657, 57 So.2d 219), construed the language of R.S. 23:1209 that `the limitation shall not take effect until the expiration of one year from the time the injury develops', to mean that prescription does not begin to run until the time the workman is unable to substantially perform the duties of his employment. This is a fair interpretation of the statute and in keeping with the beneficent object of its enactment. Development, as applied to a compensable injury, signifies something more than occurrence and pain. It connotes the time when disability to perform work becomes manifest either to the injured employee or his employer. In the case at bar, it is obvious that manifestation of plaintiff's incapacity did not occur until October 26, 1953."
There are many cases interpreting the quoted statute and the cited jurisprudence. We do not think it would serve any useful purpose to engage in an extended discussion of these cases. The facts herein bring this case within the landmark trilogy rationale. That rationale tends to encourage rather than penalize an employee who seeks to continue working despite what, in legal contemplation, turns out to be disability. This is advantageous to both the employer and the employee. We cannot consider an employee with the same knowledge and inclination of an attorney.
It makes no difference that there was an initial manifestation of disability. This was the general situation in the cited trilogy. See also Bigham v. Swift & Company, 229 La. 341, 86 So.2d 59 (1956) and Manuel v. Travelers Insurance Co., 46 So.2d 319 (La.App. 1st Cir., 1950).
Nor do we think the fact that compensation was paid and stopped preclude application of the development of injury rule. see Payne v. Travelers Insurance Co., 299 So.2d 913 (La.App. 3rd Cir., 1974).
In oral argument, defendant-appellee argues that the true rule to be gained from the results, if not from the language, of the jurisprudence relative to R.S. 23:1209, is that once compensation has been paid and stopped the prescriptive period begins to run from the cessation of payment. We are unable to formulate such a rule from either the results or the expressions in the jurisprudence. Doubtlessly, payment of compensation tends to confirm the initial manifestation of disability but does not bear on a remanifestation after the employee returns to work. The rule that cessation of payments will commence a running of prescription is true when the payments are relied upon as interrupting the prescription. It is not controlling when the commencement of the prescriptive period is delayed because of a later remanifestation of the disability.
Specifically, the defendant-appellee relies on the cases of Guillory v. Maryland Casualty Company, 227 So.2d 620 (La.App. 3rd Cir., 1969); Hobley v. Phoenix of Hartford Insurance Company, 233 So.2d 589 (La.App. 4th Cir., 1970); Joffrion v. Sears Roebuck & Company, 272 So.2d 725 (La.App. 3rd Cir., 1973); Blanchard v. Liberty Mutual Insurance Company, 280 So.2d 592 (La.App. 3rd Cir., 1973).
In the Guillory case, plaintiff sued more than one year after he quit work but within a year from the date that he consulted a doctor. The court stated:
"The present is also to be distinguished from situations where, after the initial manifestation, the disabling nature of the injury becomes latent; only to be activated *225 later by a new trauma or otherwise. Croswell v. Wells, La.App. 2d Cir., 102 So.2d 794; Manuel v. Travelers Ins. Co., La.App. 1st Cir., 46 So.2d 319. Under these circumstances, the later remanifestation is regarded as the time when the injury "develops" (again), so that a suit brought within a year of re-manifestation is timely. Here, however, the evidence shows no remission, but rather a continuous manifestation of the injury, which thus developed at or soon after the accident." (Footnotes omitted).
We note that herein there was perhaps not a total remission but it was enough to bring plaintiff back to his job for six months. He was discharged as able to return to work, did so return and substantially fulfilled the duties of his employment during that time. It is sufficient that the plaintiff returned to his employment under the impression that he would be able to continue in it or with the hope that he could do so.
In the Hobley case, plaintiff ceased work because of pain in June, 1967, but did not sue until August, 1968. Under the applicable rule, more than a year elapsed from the manifestation (cessation of work) and the suit filing.
In the Joffrion case, the plea of prescription was denied.
In the Blanchard case, the court held the cause of action had perempted and was lost forever and not revived by a resumption of benefit payments. Over three years had elapsed from a first cessation of payment of benefits to suit filing date and over two years had elapsed from said original cessation until a resumption of payments. The holding in that case is not applicable here.
Defendant complains that as a result of an automobile accident subsequent to the March, 1974 surgery, plaintiff's present disability and its causes are so uncertain that the denial of prescription herein would greatly prejudice its defense. We acknowledge the problem but think that the question of causation must be examined separately from that of prescription. See the Bigham case, supra.

DISABILITY AND CAUSATION
Subsequent to the March, 1974 surgery, plaintiff was examined by Dr. Schneider on April 2 and 29 and on May 14 and June 4 at which last date he was released to resume employment subject to a return checkup in six weeks which was not kept. On May 1, plaintiff resigned from the police department. On May 10 he was in a serious automobile accident in Bossier City in which his car was rear-ended and the other vehicle climbed atop his car. On the May 14 visit, Dr. Schneider examined plaintiff's right knee and found it improving and noted no injuries to it. He did find some muscle spasm in the back. Plaintiff has all along denied any injury to his right knee as a result of the automobile accident.
Shortly after the corrective surgery in March of '74 until about July, plaintiff held several jobs as a welder's helper which according to him was of a lightheavy nature. In July, plaintiff went to work for Olin Mathieson as a pipefitter and continued in that employment until January, 1975, at which time he took sick leave. On February 16, he had surgery in Houston for a disc condition apparently resulting from the automobile accident. On March 22, 1975, plaintiff returned to Dr. Schneider's office complaining of trouble with both knees. Dr. Schneider's examination confirmed by objective observation these knee complaints. On April 2, 1975, the doctor operated on plaintiff's left knee. From March, 1975, until trial on June 4, 1975, Dr. Schneider treated plaintiff's right knee conservatively. The doctor was the only expert whose evidence was in the case and he testified at trial. Concerning his examination of plaintiff on May 13, approximately *226 three weeks prior to trial, he stated:
"Q. And on your last examination of May 13 you found good motion, no swelling, no effusion of the right knee?
A. Yes. Now you see we have been he had been on medication, and he had been treated conservatively referable to the right knee, and when I saw him on May 13 the right knee was better, but I can't at this time say he is well, because he is still under followup, and he still has some residuals.
Q. He is under followup also for his left knee?
A. For the left knee also; yes, sir, because when I put him in the hospital his right knee was bad, as well as the left knee."
Dr. Schneider's testimony shows that plaintiff was not able to return to his duties as policeman either at the time of trial or at any specific time thereafter. Conceding that the left knee involvement is not related to the July, 1973 on-the-job accident, we still think plaintiff has made out his case for a present award of total and permanent disability involving the condition of his right knee.
With regard to the question of causation, some, but not preponderating doubt, was cast on the issue of causation by the testimony of Dr. Schneider as follows:
"Q. Well, we have a problem because the man has had several accidents and several injuries. This lawsuit is about his right knee injury. My question is this, you discharged him after you operated on him in June of '74 to return to his regular duties?
A. Right.
Q. Have you seen anything about his right knee since that time that would cause you to change that opinion?
A. Well, the difficult problem is there is a long hiatus in there when I didn't see him, and yet he comes back with a complaint that he has been having trouble with his knee. As of my examination of March of this year
Q. '75?
A.  whenin '75 when I saw him in the emergency room, and subsequently followed him. And at that time his examination revealed definite findings referable to the right knee. The thickening of the tissues, the reddening of the tissues, looking almost as though there had been a relatively recent contusion to the knee. Now this is pure speculation, but pathologically this is what it looked like.
Q. Yeah.
A. As though the knee had been bruised, or hurt, or something had happened to it. Now I didn't in any way refute what Mr. Hebert might say to this, except to testify that this is the way the knee looked to me.
Q. Yes, sir, I understand. That was in your March, '75 exam?
A. Yes, sir, that's correct."
Plaintiff testified that after his March, 1974 surgery he suffered no separate accident or untoward event involving his knee but continued to have trouble with it in the form of locking, swelling and pain. He stated that while in the hospital in Houston it became extremely swollen. This was corroborated by his mother. She stated that plaintiff had been confined to bed for several weeks prior to that swelling incident. According to plaintiff, the doctor in Houston advised him to consult Dr. Schneider regarding the knee when he *227 would return to Lake Charles. We do not think corroboration by the Houston hospital personnel of that swelling is absolutely necessary to plaintiff's discharge of his burden on the issue of causation.
Some detraction from plaintiff's credibility is found in an impeachment wherein plaintiff denied having told Dr. Schneider that he had injured his knee in a basketball game about a year prior to the July, 1973 on-the-job accident. However, we do not choose to apply the falso-in-uno rule in this case. We are too impressed with this man's conduct to conclude that he has falsified as to whether his right knee suffered an additional injury which might be an independent and noncompensable cause of the disability at trial. He immediately resumed work when discharged in 1973 and persisted in attempting to maintain his job despite varying episodes of pain, swelling and locking. After the March, 1974 surgery he sought and maintained several jobs before even being released by the doctor in June, 1974. Despite recurrent back left leg pain, he maintained the pipefitter's job with Olin Mathieson for about six months until apparently forced to take sick leave and submit to the back surgery.
Although the issue is very close, we cannot say that the record as made up fails to preponderate in plaintiff's favor on the issue of causation. Plaintiff suffered a definite knee injury in July of 1973 which required corrective surgery in March of 1974 and disabled him thereafter until at least June, 1974. Dr. Schneider examined him four days after the automobile accident and noticed no injury to the knee from that event. Plaintiff denies any separate injury to his knee and there has been intermittent, if not continual, problems with the knee during the times involved. The last acute conset occurred while he was in a hospital and has continued until trial. We think the proof taken overall is sufficient.
Plaintiff's claim for penalties and attorney fees will be denied. The record does not reveal any demand for payment of compensation prior to suit. At that time, there were serious questions of disability and causation.
Accordingly, for reasons assigned, the judgment of the district court sustaining the exception of prescription is reversed, said exception is overruled, and there is now judgment in favor of plaintiff, Gilbert Wayne Hebert, and against Hartford Accident & Indemnity Company for:
(1) compensation at the rate of $65 per week commencing July 25, 1973 for the duration of his disability, not exceeding 500 weeks with interest at the rate of 5 percent per annum on each past due installment from its due date until paid subject to a credit for compensation paid from July 25, 1973 until March 12, 1974,
(2) all medical expenses incurred by plaintiff and attributable to the condition of his right knee, subject to the limitation provided by R.S. 23:1203 as amended, and
(3) for all costs of this proceeding.
REVERSED AND RENDERED.
CULPEPPER, J., dissents and assigns written reasons.
CULPEPPER, Judge (dissenting).
At issue here is the construction of the following portion of LSA-R.S. 23:1209:
"Where such payments have been made in any case, the limitation shall not take effect until the expiration of one year from the time of making the last payment. Also, where the injury does not result at the time of, or develop immediately after the accident, the limitation shall not take effect until the expiration of one year from the time the injury develops,. . ." (Emphasis supplied)
I can agree with the majority that in the situation where the disabling symptoms of the injury disappear and compensation *228 payments are terminated, a new period of prescription of one year will nevertheless commence where there is either a new injury or a remanifestation of the symptoms of the initial injury. Actually, the only case which I find supporting this rule is Seago v. Continental Casualty Company, 294 So.2d 912 (La.App. 2d Cir. 1974). In that case, plaintiff injured his back on December 20, 1969. A herniated disc was surgically removed on January 7, 1970. Plaintiff returned to work in June of 1970 and workmen's compensation payments were terminated. Plaintiff was symptom free for a short time and then scar tissue developed at the site of the surgery, requiring a second surgical procedure to fuse the vertebrae. The court held that the development of this scar tissue was a second injury, or a remanifestation of the original injury, from the time of which a new period of prescription of one year commenced.
I find that the present case is distinguished from Seago on the facts. Here, there is not even a contention that there was a second injury. Furthermore, I do not think the evidence supports a finding that there was a remanifestation of the symptoms of the initial injury. Although compensation payments were terminated and plaintiff returned to work on September 12, 1973, his symptoms continued. The majority opinion concedes that after plaintiff returned to work he continued to experience pain, swelling and intermittent locking of his knee after periods of activity. Finally, plaintiff went back to Dr. Schneider, and the doctor decided plaintiff had a deranged medial meniscus. The meniscus was surgically removed on March 14, 1974. However, Dr. Schneider was unequivocal in his testimony that the injury to his meniscus was the result of the original accident on July 25, 1973. There was no new injury. Furthermore, the symptoms of the original injury had never disappeared, and there was thus no remanifestation of symptoms.
For the reasons assigned, I respectfully dissent.